SCHOTT, Judge.
This is an appeal by Hamilton Bros. Oil Company, International Petroleum Trading Company, SDAD, LTOA, (hereinafter collectively referred to as IPTCO) and their insurer, American Home Insurance Company, from a summary judgment in favor of Coastal Fuels, Inc. (Coastal), dismissing the third-party demand of appellants against Coastal.
The proceedings were initiated by Good Hope Refineries, Inc. against appellants for damages to its refinery catalytic cracking unit, commonly referred to among the parties as a cat cracker. Good Hope alleged that it purchased a reduced crude oil from IPTCO in September, 1975, for processing in its vacuum unit and cat cracker. Although normal tests were run on the material purchased, immediately after it was introduced into Good Hope’s equipment it caused the damage to the equipment because the material was defective and unsuitable for use as a “cat feed.”
The purchase of the material was negotiated by Good Hope’s president, John Stanley, with IPTCO’s representative, Stan Cor-bitt. IPTCO was a broker trading in petroleum and other fuel products. Having learned from Stanley that Good Hope was in the market for eat feed, Corbitt contacted Coastal’s president, Jim Ethridge, who was supposed to have such material available for sale. IPTCO’s third-party demand is based on Coastal’s alleged sale to IPTCO of a product which was defective, its strict liability to IPTCO and Good Hope as the manufacturer of the material, and its negligence in dealing with IPTCO in the sale of a defective product or one which was not suitable for the purpose for which it was intended.
Depositions of Corbitt, Stanley and Eth-ridge were taken as well as Claude Phelps, a chemist employed by Good Hope. In the course of those depositions a number of issues arose which will necessarily be resolved at the trial of the main demand between Good Hope and IPTCO, but the judgment before us is limited to the third-party demand. In order for the summary judgment to be sustained it must be clear from the pleadings, depositions and affidavits that there is no genuine issue as to material fact, so that Coastal is entitled to a judgment dismissing the third-party demand of appellants as a matter of law. C.C.P. Art. 966. If there is any reasonable *50 doubt as to the presence of any genuine issue of material fact the doubt must be resolved against the mover and summary judgment procedure is not intended to be a substitute for a trial on the merits. Laufer v. Touro Infirmary, 334 So.2d 541 (La.App. 4th Cir. 1976). A discussion of the contents of the depositions indicates that these principles require us to reverse the judgment.
Phelps testified that he tested the material which had been supplied by Coastal after the breakdown of Good Hope’s machinery and found that the material had a high salt content so that when it was heated during the refining process hydrochloric acid developed and caused damage to the metal members of the machinery. The salt content of Coastal’s product was seven times that of the product which Good Hope had stocked for use as cat feed. Before Coastal’s product was purchased Phelps had tested the product for such features as viscosity, gravity, sulphur content and other physical characteristics, but such tests did not include a determination of salt content. He explained that those materials which come from oil refineries are necessarily desalted in the refining process and Good Hope assumed that the product it was buying came from an oil refinery.
Stanley testified that Good Hope was interested in purchasing either virgin reduced crude oil, vacuum eat feed or atmospheric gas oil, and he so informed Corbitt. As far as Stanley was concerned, everyone in the industry knows that these products originate from oil refineries and do not come from chemical plants. He would not purchase material for cat feed which came from a chemical plant nor would he purchase material which was designated as fuel oil or residual fuel oil for cat feed.
Corbitt, whose deposition was taken before Coastal was made a party to these proceedings, was aware that Stanley needed this material for cat feed and after locating Coastal’s product had a sample of the product tested by an independent chemist. This is the same type of test which Phelps described and which specifically did not include a test for salt content. He advised Stanley as to the test results and specifically told Stanley that he did not know the origin of the material.[1] Corbitt testified that he gave this admonition to Stanley because he thought it might be reclaimed motor oils and would have metals present in the substance. They arranged for a sample to be sent to Phelps and thereafter the purchase of 20,000 barrels was agreed upon. In the discussions between Corbitt and Eth-ridge the material was called residual fuel or fuel oil. In the telegram of confirmation of the sale to Stanley, however, Corbitt used the term reduced crude. Corbitt testified that Ethridge was secretive about the source of the material and he, Corbitt, told Ethridge it was to be used as cat feed, but Ethridge did not seem to be technically knowledgeable about the material. After the damage occurred at Good Hope’s refinery and Stanley called Corbitt to tell him that a lawsuit was imminent, when Stanley suggested that they both sue Coastal Cor-bitt told Stanley that he did not feel that Ethridge had misrepresented anything.
Ethridge testified that his products were fuel oil and generally came to him as black oil, residual fuel oil, No. 5 or No. 6 oil, or chlorinated hydrocarbons. Some of his materials emanated from chemical plants but, in speaking to Corbitt, he stated that the material had come from “refineries” which he thought was broad enough to include chemical plants as well as oil refineries. He did not tell Corbitt that they came from chemical plants because he did not wish to disclose his source. He took the position that his sales were strictly by sample, he did not profess to have any great technical knowledge of the business and if the customer was satisfied with the sample he would sell him that product. In getting materials from various sources these would all be pumped into the same tank and blended together. From this testimony, we *51 have inferred that chlorinated hydrocarbons were mixed in various degrees with the oil products Ethridge was buying.
We have detailed the testimony to this extent because this very exercise demonstrates the inappropriateness of the summary judgment procedure for disposition of the third-party demand in this case. Prom all of the depositions it appears that there are issues of material fact to be resolved at a trial. When Ethridge stated that his products originated from refineries this raised the question of the meaning of the word in the industry as limited to oil refineries or extending to chemical plants as well. The question arose as to the presence of a duty on Ethridge’s part to know or to learn if his product was suitable and safe for use as a cat feed or, if having determined that this was the intended use, he was under a duty to disclose that it was not a product originating in an oil refinery. An issue was raised as to the presence of high salt content in Coastal’s product which ultimately caused the damage, and whether the presence of this high salt content in Coastal’s product was such as to constitute a breach of warranty on the part of Coastal or a breach of duty to learn or to warn his customers of the presence of the salt. The issue as to Coastal’s being the manufacturer of the substance enters into this question of the duty it had to IPTCO and Good Hope. We have concluded that there are a number of questions unanswered and a number of issues which can only be resolved by a trial on the merits.
Accordingly, the summary judgment dismissing the third-party demand of IPTCO and its insurer, American Home Insurance Company, is reversed and set aside and the matter is remanded to the district court for further proceedings. The costs of this appeal are taxed against Coastal Fuels, Inc., third-party defendant. Other costs will await the outcome of the case.
REVERSED AND REMANDED.

. All of the parties were secretive about the origin of their materials because each was afraid that the others might go direct to his supplier to make a purchase, thereby eliminating the middle man.